Good morning, Your Honors. My name is Maureen Rosette. I'm the attorney for Mr. Nollen, the appellant in this matter. As you are probably aware from the brief of the appellant, Mr. Nollen applied for disability benefits under Social Security for Social Security benefits on March 6, 2007. This was approximately a year after he had been hospitalized for over a month because of frostbite to his feet. As a result of that, it resulted in idiopathic peripheral neuropathy in both of his bilateral feet. And as you see throughout the record, he spends a lot of time either in the emergency room or later on at Chas Clinic complaining of the problems with his feet. He goes to physical therapy at St. Luke's Rehab, and at that time they're telling him he may need the arm crutches. They recommend that he stay off his feet the entire time, or as much as possible, but he's in a homeless shelter throughout much of this time. He's in homeless shelters in Colorado Springs, Colorado, and then in Spokane, Washington. And then just about a month prior to the hearing, he was able to get into an apartment. And then at that time, the judge had indicated, and my major argument on this matter, Your Honor, is at the hearing, and throughout the history of this client, he's had some issues with alcohol. There's no question about that. He's had some issues with alcohol, but the judge did find that it was not material to his disability, which is a physical problem. But he used that basically to deny our client benefits because he didn't properly reject, or we're arguing that he didn't properly reject Mr. Nolan's symptom testimony. He says the administrative law judge indicated that Mr. Nolan was not credible, and he indicates that his physical limitations were not fully credible. Well, number one, all the treatment providers at Chas Clinic, and you look through their notes, they say he's a good historian. Dr. Bagby indicates when he evaluates him that he's got good motivation, or normal motivation, I should say. And Dr. Chandler, the individual who completes a psychological evaluation of him, indicates there's no evidence of malingering. And then the ALJ's other statement regarding his credibility is that daily activities do not reflect such limitations. As I needed to remind you is that he was in a homeless shelter throughout the majority of time that he was applying for disability benefits, and I don't know if you're aware of how homeless shelters work, but you don't get to really stay there. You have to do some jobs usually to stay at the homeless shelter, and a lot of times you have to leave the shelter, which he was doing. He would go, and his activities were going to feed the ducks at the park. But didn't he testify at the disability hearing that he elevates his feet most of the day and can walk one or two blocks and needs to rest, and yet he reported, for example, to the Community Health Association in June of 2007 that he gets blisters when he walks a mile or so. That suggests he walks a mile or so. Isn't that at least arguably inconsistent and a basis for the ALJ's decision to discredit? Arguably, but the judge didn't use that. He did not use that as one of the reasons for it. But the other thing is that, like I said, he says he walks a block and then he rests for five minutes. He says that all through the record when he filled out his function report. He says that I can walk a block or two and then I have to rest for five to ten minutes. Well, you can walk a block or you can walk a mile, but what he was doing was resting in between. And then if he walked a mile, then he would get blisters. So it seems like he wasn't being credible, but he was. He was saying all throughout the record, my feet hurt if I walk for a block or two. You see it all through the record in his function reports, in his reports to the doctors, in the reports to the physical therapy people, same things. He's saying the same things over and over, but he has to do something with his day because he's in a homeless shelter. He can't sit around in a homeless shelter. So he'd either go to the library or he'd sit feeding ducks at the park. And then when he did get an apartment, which is about a month before the hearing, he was sitting around all day basically, and that's what he said. I need to elevate my feet. It feels better. And the people at the physical therapy, St. Luke's Rehab, had indicated that he had edema in his legs and that he needed to elevate his feet. They also recommended that he use hand crutches because of the pressure it was putting on his feet because he did have one of his right great toe amputated. So the ALJ basically was, he was making arguments to discredit Mr. Nolan, but they were based on how often he said he drank basically, mostly that. But the arguments he gave were, the basic arguments were that his physical limitations were not fully credible, which they are credible because they're consistent throughout the record. And everybody that examined him and his treating doctors said he was a good historian, had normal motivation, there was no evidence of malingering. So based on the case law that I submitted for credibility, if you have an objective, if you have an impairment, which he did, he had peripheral neuropathy of his bilateral feet. There's a relationship which exists between his impairment and some level of symptoms. He has a lot of pain. I believe you saw his medications. He's taken gabapentin. He's taken morphine. Ms. Rosette, this is Barry Silverman in Phoenix. I wonder if I could ask you about the government's point that any misstep by the ALJ with respect to residual functional capacity was harmless. Could you comment on that, please? I can. And what was happening, I believe that she was referring to the fact of Dr. Bagby and that I had used, and I mistakenly used, and I'll admit this, in the vocational questioning regarding Dr. Bagby's opinion, he had actually, Dr. Bagby had evaluated him. I had argued that Dr. Bagby had indicated that Mr. Nolan was capable of doing sedentary work and that I believe the argument from the government was that because of that, there was harmless error because the ALJ had basically asked the vocational expert whether he could work with a sedentary work, at jobs with a sedentary work, and that it was harmless error because that had been answered, which is somewhat true, but there's some, I need to make an argument about that as well because Dr. Bagby, his limitations, the ALJ had actually said when he gave the vocational hypothetical, he said for sedentary, he could do 10 pounds occasionally and 10 pounds frequently, but Dr. Bagby's limitations that he had given were 10 pounds maximum and frequently lift or carry such articles as files or small tools and that a sedentary job may require sitting, walking, or standing for brief periods, while the ALJ had indicated that Mr. Nolan could stand or walk for two hours and an eight-hour period. Those are not brief periods. That's too long for him to be on his feet, and that was not taken into consideration in the vocational question or in the vocational expert's hypothetical. I'd like to ask a question on that, but before I do, I want to understand. Did you just concede that you misquoted the transcript? I did, and I didn't realize it until last night when I was reading it again and I read my brief, and I had thought that the administrative law judge in my argument, yeah, okay, so anyway, but he did technically not, he did not take into, when you look at Dr. Bagby's opinion, the ALJ did not exactly take into account the exact limitations given by Dr. Bagby either, so that wasn't exactly a good hypothetical question. Let me ask about that. The ALJ cites Dr. Bagby's finding that Mr. Nolan's difficulty walking was due to pain created by, as I read it, contact of his feet with the floor, not by a weakness there. It's because of the pain. Right, right. And the ALJ also cited Dr. Bagby's finding that Mr. Nolan's, quote, power at the ankles and knees were normal, which again suggests he doesn't have weakness in his feet or legs. It's really the pain with the feet contact that's the problem. So doesn't this reasonably suggest that Dr. Bagby's decision to classify Mr. Nolan as capable of sedentary work was a result of postural limitations, i.e., the need to sit down for most of the day, rather than exertional limitations, that is, the inability to lift? Well, Mr. Nolan also testified credibly, I believe, that any kind of lifting caused pain in his feet. In a seating position? Well, actually, he just said he can't lift anything. He didn't actually say in a seated position. He just said, I can't lift. When asked how much can you lift or carry, he said zero because it hurts my feet. What findings are in the Bagby report that would support a conclusion that Mr. Nolan could not lift things? Could not what? Lift items. Well, all it said was he can lift a maximum of ten. There's definitions in that report completed by Dr. Bagby on 379, and it says sedentary work means the ability to lift ten pounds, or a maximum, I should say, and frequently lift or carry such items as files or small tools. So that tells me that there's less than ten pounds maximum, which is our frequent ten pounds, which is what the judge asked the ALJ in the hypothetical question, was ten pounds occasional and ten pounds frequently. And the vocational expert said, oh, with that, there's no change in my answer to the hypothetical. But he didn't add in that it was less than ten pounds frequent and that he can only sit, walk, or stand for brief periods. So I don't know how that would have changed the vocational expert's answer to that hypothetical. But his prior answer had been about jobs, restricted jobs concerning sitting, right, doing the job sitting. Well, no, he said two hours or six hours sitting, two hours standing. But this says in the definition on sedentary, it says sitting, walking, or standing for brief periods. Now, it also defines occasional. Occasional means being able to function from very little up to 2.5 hours an hour in an eight-hour day. Well, that's, if you look at that and you take brief from that, that's less than whatever. I don't know, but it's less than that, Your Honor. So, I mean, based on those definitions, that tells me that it was less than two and a half hour or two hours of standing and walking in a day. And so that was never asked to the vocational expert. Then, moving on to what my original argument was about the credibility, was that I believe that Mr. Nolan was credible and that he did need to elevate his feet. There was indications that all throughout the record, as you indicated, it is, he can't, he doesn't like to have shoes on his feet, can't actually touch things with his feet. Blankets hurt his feet. Anything touching his feet hurts because of the neuropathy. So he needed to elevate it. He said he just sits around and elevates his feet throughout the day and that when the vocational expert was asked to consider that hypothetical, taking into account his need to elevate his feet, and actually it was less than what Mr. Nolan had said. The ALJ had indicated every two to three hours for 15 to 20 minutes and Mr. Nolan had said he needed to elevate his feet seven to eight times a day for 15 to 30 minutes at a time. So it was a little bit different than what Mr. Nolan said. But even with the lesser amount, the vocational expert said he can't work. No job at the production or those levels is going to allow this man to work. And so my argument is that Mr. Nolan was credible. The ALJ did not set forth clear and convincing reasons and did not specifically state why his need to elevate his feet throughout the day was not credible. He gave other reasons. What I told you is about the alcohol and how often he used it. But he said the use of alcohol was not material to his disability. So it's kind of inconsistent saying you're not credible because you say you drink alcohol and you don't drink alcohol, but you do. But alcohol is not material to your disability, but I'm still finding you not credible. But all the people that, the treating physician, the examining physicians, all felt that he was a good historian, was not malingering, and had normal motivation. So there's no indications in there that there was any affirmative malingering and that because of that, Mr. Nolan believes that the ALJ's decision should be reversed. One of the things I don't know that you have specifically addressed is Mr. Nolan's failure to follow a prescribed course of treatment sufficient. I was going to bring that up because he did, I kind of came up with a timeline for Mr. Nolan because I was trying to figure out what happened at St. Luke's because I saw at the end of St. Luke's there was some, he had missed a lot of appointments and he in fact got discharged because he had missed appointments. But at that same time that he was at there, he was also, he ended up at the mental health because he was threatening suicide. So he was having some depression issues at the time. He was, well, it wasn't hospitalized. He was at a stabilization house for mental health individuals. And then from there he went to inpatient treatment for the alcohol use and abuse. So he was doing the physical therapy until he became too depressed. And then when you read, when you hear him in the record, Your Honor, St. Luke's rehab had indicated that they wanted him to use the hand crutches and that scared him and he said that, in the record he said, I'm too scared, I don't want to be in a wheelchair, I don't want to have crutches. So I think that was part of it as well is that he's not very well educated and I think he thought having crutches or being in a wheelchair was going to be at his age was just too much. All right, thank you. Thank you, Your Honor. Good morning. Nancy Michelini for the Commissioner. May it please the Court. This Court should affirm the District Court opinion because the ALJ reasonably found that there were a significant number of sedentary, unskilled jobs in the national economy that Mr. Nolan could perform. The ALJ's decision is supported by substantial evidence and it's free of all legal harmful error. I wanted to respond to one point about the crutches that counsel just mentioned. In his testimony at the hearing, Mr. Nolan, he was asked that question by the ALJ if he needed crutches and he said no, he did not use crutches, nor did he need them. The other issue that I wanted to respond to is the two hours of standing and walking, it's up to two hours and it's not continuous in the RFC finding. And so in this case... What about the answer to my question on the credibility of the discrediting of Mr. Nolan, Pelton's counsel argued that the ALJ did not rely on the activities that I mentioned about blisters when he walks a mile, but he didn't rely on that when he came to analyze the nature of Mr. Nolan's activities vis-à-vis the nature of the medical assessments of his condition. Certainly. Actually, he did. In the ALJ's decision beginning at page 67, he reiterates all of Mr. Nolan's testimony. So first he goes through and reiterates all of the testimony. Page 67? 67. It's the first full paragraph, the claimant testified in part at the hearing, and then it goes on from there. Okay. And so there are about three, four pages here that the ALJ devoted to the credibility finding. And so he first sets it up saying, Mr. Nolan alleges these things, and then he goes through and says, but here is what the evidence shows, and then lists everything. And I have it all listed in my brief. The daily activities was inconsistent with what he testified at the hearing, because he testified at the hearing that he could only walk one to three blocks, he could only stand for 30 minutes, and he could only sit for 10 to 15 minutes. However, the ALJ pointed out that in the June 2007 report of Dr. Chandler, he said that he was walking everywhere. He's feeding the ducks in the park for four to five hours. He's going to libraries, reading magazines. He's going back to the park again, and then he's walking back to the shelter. So he is walking good distances, much longer, and I don't know what the distances are, but it's certainly much longer than, you know, one to three blocks. And in terms of sitting for only 10 to 15 minutes at a time, well, the hearing lasted for an hour, and there's nothing, no evidence in the hearing whatsoever that he needed to change position, that he asked to stand up, or that he asked to elevate his feet. Now in terms of elevation of his feet, I realize Mr. Nolan is alleging that he needs to elevate his feet. And actually, in the physical therapy record that counsel referred to, he says that he elevates his feet at night. He didn't say that he needed to elevate his feet all day. He said he did it at night. And I would submit that there is no medical evidence, there's no treating or examining physician, no primary care provider that says that he must elevate his feet. Did the ALJ include Dr. Bailey's assessment about limitations in concentration, persistence, and pace in the hypotheticals to the VE? I'm sorry, Dr. Bagley? Dr. Bailey's. Oh, Dr. Bailey, I'm sorry. Yes. Did he include the – His assessments about the limitations. Yes. Where is that? In his RFC finding. Actually – Well, I don't think it's – It's not in the RFC finding. That's correct, Your Honor, it's not. Dr. Bailey said, and I'm looking at his functional capacity assessment, because that's what you look at. It's the third part of the mental residual functional capacity assessment. So the first part is the summary conclusions, and this is basically a checklist for the consultant to use, and then they are supposed to give their functional capacity assessment on the last page there. And so in the – I'm not sure, did you answer my question? Did the ALJ include Dr. Bailey's assessment about limitations in concentration, persistence, and pace in the hypotheticals? First, I want to note that, and then, if you could, did he state a reason for not incorporating those findings about limitations in concentration, persistence, and pace in his RFC? Okay. The first question is, did he include? And the limitation for concentration, sustained concentration, and persistence is he's moderately limited in the ability to carry out detailed instructions. And that's it. Is that in the RFC finding? No, it's not. However, it's accounted for in the vocational expert's identification of jobs that are unskilled jobs. So unskilled work. Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. And so the answer, and I'm just – because I know you're looking at your papers here, but I just want clarity. So the answer is no, that the ALJ did not state a reason for not incorporating Dr. Bailey's finding about those limitations? He did not – that's correct. He didn't include simple. He didn't say only simple jobs in the RFC. He did not include that. However, if the court finds that that's error, the error is harmless. And the reason that it's harmless is because all of the jobs identified are simple work. It's unskilled work, and unskilled work is simple work. If you look in the medical vocational guidelines in the appendix at 201, it discusses sedentary work. And it says there are approximately 200 separate unskilled sedentary occupations, each one representing numerous jobs in the national economy. And these jobs, these unskilled sedentary occupations, may be performed after a short demonstration or within 30 days. And so that certainly accounts for any – accounts for the limitation that he can't – that he has a problem. He's moderately limited as far as detailed instructions. So the ability to understand and remember detailed instructions is accounted for. So Dr. Bailey's finding is not inconsistent with what the ALJ found? Dr. Bailey's findings are not inconsistent with the ultimate disability conclusion because the jobs are simple, unskilled jobs. So Dr. Bailey's – and, Your Honor, I'm not sure if you're talking about the – Well, that's an interesting point because it is in the – I think there is a reference in the PRTF. Certainly there is in the PRTF. And those are two completely separate documents. The PRTF is used only at steps two and three. So at step two to determine whether or not the mental impairment is a severe impairment.  So the columns that are none, mild, moderate, marked extreme, I believe. And so the regulations say that if the limitations are none or mild, we find that the impairment is not severe. So that's what that form is for. So once that form – you get through step three and you decide whether or not does the person meet the listing, then if they don't meet a listing, then you move on to the residual functional capacity. And so that's what that next form is, the mental residual functional capacity assessment. And the first page, as I stated, is just a checklist. So the areas that Dr. Bailey indicated in terms of sustained concentration and persistence, he was moderately limited only in the ability to carry out detailed instructions. And so what I'm saying is that the jobs are all unskilled jobs. So unskilled, sedentary jobs meets Dr. Bailey's limitations. Does that answer your question, Your Honor? Thank you. Could I turn you to Dr. Bagby? Dr. Bagby, yes. You first argue in your brief that the AFJ's holding was consistent with Dr. Bagby's report. Am I correct? That that's your argument? Yes. All right. As I read Dr. Bagby, he said in December of 2006 that Mr. Nolan would be limited to, quote, sedentary work, end quote, for 12 months. Six months later, before the 12 months had expired, Mr. Bigaman, reviewed by a doctor, gives an opinion that Mr. Nolan can do certain activities, 20 pounds occasionally, 10 pounds frequently. And based upon that, the ALJ found that Mr. Nolan was capable of certain varieties of light work done in a primarily sitting position. But doesn't that finding amount to a rejection of Dr. Bagby's report in favor of the Bigaman report? In other words, Dr. Bagby said that in May of 2007, this man is still going to be limited to sedentary work. Right. And the ALJ has adopted a different report that said, no, he isn't. Sure. And, Your Honor, again, I would submit that if this is an error, if the ALJ didn't adopt Dr. Bagby's, even if the court credited Dr. Bagby's opinion, if the court thinks that the ALJ didn't accept it, it still comes up with the same result because all of the jobs are sedentary. They're all performed in a sitting position. So there is no error. There's no harmful error. Well, but the question at the hearing, which we had the problem with quoting it completely, says that the vocational expert testified that jobs would be available even at a lifting limitation of 10 pounds frequently and 10 pounds occasionally. A sedentary job is only mentioned as occasional lifting of up to 10 pounds, as well as carrying items like files, ledgers, and small tools. And so isn't that inconsistent, the question to the vocational expert inconsistent with the definition of sedentary work? No, it's not inconsistent because the form sedentary work, I mean, this is the DSHS form, I believe, is what the court is referring to at 379, the one that Dr. Bagby checked off for sedentary. And using those definitions, and DSHS is the Department of Social and Health Services, and that's a state agency. I understand that. Okay. And, of course, the agency, Social Security, is not bound by any state findings. However, the definition here, this definition of sedentary says ability to lift 10 pounds maximum and frequently lift and or carry such articles as files. But they certainly can't – it's not more than 10 pounds. And the question that was posed to the vocational expert was, would your answer change if I limited him to a lifting limitation of 10 pounds? And that's – No, it would have changed if it's 10 occasionally and 10 frequently. Right, which is – I mean, it's 10 pounds, so it's 10 pounds always. So frequently equals occasionally? Well, he's saying even frequently. Even if he's lifting 10 pounds frequently, he can still do those jobs. So I'm saying that he can do any of those jobs because that isn't going to change his answer. Because what he did is he took those occupations, those particular occupations, that are typically light work, and he limited the numbers. He modified the numbers of jobs available at the sedentary level. Your Honors, I'm wondering, did the court get my 20HA letter with the – yes. Yes. Yes. Mm-hmm. I would submit to you that any error that the court sees is harmless. All of the jobs that were identified are sedentary, unskilled jobs. It's consistent with Dr. Chandler, Dr. Bailey, anyone. It's – there's no – I mean, there's no inconsistency there whatsoever. So there's no harmful error. Harmful error is error that affects the ultimate disability decision. And any error here is not harmful error. Well, but the letter doesn't really explain specifically why Mr. Nolan has failed to show prejudice here, assuming the court concludes that the ALJ did err. How do you argue otherwise? Well, it depends on what the error is that the court is finding. I would submit that the ALJ gave clear and convincing reasons to discredit Mr. Nolan. He listed – and I see my time is up, Your Honor. Okay. Thank you. I would ask the court to affirm. Thank you. I'll give you two minutes. I think you had about 37 seconds, so I'll give you two minutes. Your Honor, I just wanted to say in response to Ms. Counsel's 10 pounds at any rate would still be harmless error for Mr. Nolan. Well, when the vocational expert was asked 10 pounds occasionally and then 10 pounds frequently, he said, how much frequently? And the judge said 10 pounds, and the ALJ said no, that would still fit within the restrictive. But that wasn't what Dr. Bagby restricted answer that I gave. So that doesn't take into account 10 pounds maximum and only lifting frequently items like files and small tools. Well, the state definition is that he can lift 10 pounds. Maximum. Right. And that he can frequently lift such articles as files and small tools. Exactly. But that's not the way it was posed to the vocational expert. So he gave a restricted answer based on 10 pounds frequently and 10 pounds occasionally. And then Counsel's argument about Mr. Nolan's daily activities, I just wanted to remind you that he was homeless until a month before the hearing. And, yes, his activities of daily living did change because he moved from a homeless shelter into an apartment. And so he did become – it was to the point where he – and the physical therapy individuals who evaluated him specifically said, he needs to stay off of his feet as much as possible, which was what he was doing at the time of the hearing. Prior to that, he had to leave the shelter. And I would submit to you feeding the ducks and going to the library are – yeah, he probably had to walk to them, but he was taking rests in between. And that sitting there feeding ducks is not a big activity. You can sit at a bench the whole time you're feeding the ducks. So it's not like he's walking eight hours a day, Your Honor. He had to do something throughout the day. And that's what they – homeless shelters make you leave during the day. So that's what he was doing was using up his time. But when he got to an apartment, he was able to keep his feet up, which is what he needed to do because of the pain. Thank you. And I would submit that we need to please reverse the ALJ's decision and find Mr. Nolan to say that. Thank you. Thank you. Thank you. The cases are submitted. We had argument on Woodsview v. Kitsap and Nolan v. Astru. And we are now in recess. Thank you very much for your argument. Thank you.
judges: Hall, Silverman, Murguia